# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

JAMES KOLANOWSKI,          )
                                 )
        Plaintiff,           )
                                 )
        v.                   )        CAUSE NO.: 2:07-CV-189-TS
                                 )
CONOPCO, INC. d/b/a Unilever,   )
                                 )
        Defendant.       )

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [ECF No. 40], filed

by the Defendant on July 20, 2009.


## BACKGROUND

On October 13, 2006, the Plaintiff, James Kolanowski, filed a Charge of Discrimination

in which he alleged discrimination on the basis of sex and retaliation. He wrote the following

summary of facts, which he attached to his Charge:

> I have been having problems with Sue Szynalik (a co-worker, union
> employee) sexually harassing me for almost 1 ½ years calling me a f---ing faggot
> [sic], I would turn away from her abuse and she would smack me on the ass with
> a flashlight and say things like bend over so I can stick it up your ass, or say
> things like come on, bend over and she would make gestures like she was
> humping (f---ing) me. I asked her to stop but it continued.
> This all started with [S]ue when I was training for a control room job. I
> told Don Fedor, who is in management now and in charge of the training, and
> other managers several times about the sexual harassment and was told by Don
> Fedor if he hears about it again he would disqualify me from the control room. I
> told Don Fedor I never once said anything back to her for what she was saying
> and doing to me. Don Fedor said it's not his problem. I have had problems with
> Don Fedor, I bid off his crew years ago because of his verbal, mental, sexual and
> physical harassment. He's even been threatening to get me fired for telling a
> department manager about him being a hot head and throwing a chair thr[ough]
> the control room window when he was union employee. Sue retaliated against me
> for telling management about people not training me and for her sexual

harassment. She would not train me for the control room job and her sexual harassment made it a hostile working environment for me. I worked and studied very hard for this position on my own and with help from others who were control room qualified but were not in the control room like Sue always was and I passed all the tests.

Because of this I was retaliated against by Don Fedor and disqualified from the control room job. I then s[aw] the Department Manager Kelly Sheppard and Plant Manager Brad Tieke walking through the 2nd floor where I was working. I told them about Sue and Don and was told by Kelly Sheppard "I need to watch what I'm accusing somebody of". I told them this is what happened[.] I was then told to make sure it's not because I'm upset about Don failing my certification.

Sue's sexual harassment still did not stop. Don would harass me by, following me, at times walking in front of me when I was on the fork lift, looking for things to try and write me up for. I would tell Kelly Sheppard about what was going on and nothing ever changed. I also talked to Chris Cole, Human Resource Manager and nothing ever changed.

In June we had a tour coming through my work area and I finished my work and left the area as I had been told to do for 14 years. I was discharged for allegedly playing bingo (a company sponsored bingo) for two hours in the break room, which I could not have done. The bingo only lasted 1 ½ hours. I deny the company's allegations that I played bingo for 2 hours. Other employees were playing bingo longer than I was and were not disciplined. I believe I was sexually, verbally, mentally and physically harassed and discharged in retaliation for reporting these issues repeatedly to management just like the Unilever Code of Business Principles says that I have a responsibility to uphold and report any issues of discrimination.

I do not believe they investigated any of my issues and the[ir] resolution was to terminate me.

I feel because I went to management I was retaliated against by some union members and management[.] I did not want to fight anybody so I would not get in trouble[.] I thought I was doing the right thing by reporting this to management.

(Pl. Dep. Ex. 40, ECF No. 42-5 at 26.)

On June 8, 2007, the Plaintiff filed a Complaint and Jury Demand [ECF No. 1] in this Court claiming discrimination on the basis of sex (sexual harassment) and retaliation under Title VII.[1] On May 18, 2009, the Plaintiff filed a Second Amended Complaint and Jury Demand [ECF

---

[1] According to the Complaint, the Plaintiff received a Dismissal and Notice of Rights on March 13, 2007.

No. 36].[2] On May 27, the Defendant, Conopco, Inc. d/b/a Unilever filed an Answer [ECF No. 38].

On July 20, 2009, the Defendant filed a Motion for Summary Judgment [ECF No. 40], a Memorandum in Support [ECF No. 41], a Statement of Undisputed Material Facts [ECF No. 42], and an Appendix [ECF No. 42-2] with evidentiary materials in support of its Motion. On August 28, the Plaintiff filed a Response [ECF No. 43], an Index of Appendix [ECF No. 43-2] with evidentiary materials, and an amended Index of Appendix [ECF No. 44]. On September 10, the Defendant filed a Reply Memorandum [ECF No. 45].

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that motions for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 608–09 (7th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). Under Rule 56(e)(2), a party opposing a properly made and supported motion for summary judgment "may not rely merely on

---

[2] The Second Amended Complaint, like the original Complaint and the Amended Complaint, states that this action asserts claims under Title VII "among other state law claims." (Second Am. Compl. ¶ 1; *see also* Compl. ¶ 1 & Am. Compl. ¶ 1, ECF No. 35.) The Plaintiff has not alleged any jurisdictional basis for any state law claims or any cause of action under state law. Rather, the Plaintiff's allegations are framed with reference to Title VII alone. At the telephone status conference conducted on January 14, 2010, counsel for the Plaintiff confirmed that the Plaintiff is not asserting any claims under state law. Accordingly, the Court understands the Second Amended Complaint to allege no state law claims and the reference to state law claims to be inadvertent and mistaken.

allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." A court's role on summary judgment is not to weigh the evidence, make credibility determinations, or decide which inferences to draw from the facts, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 255; *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Thus, a court in ruling on a summary judgment motion construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *AA Sales & Assocs.*, 550 F.3d at 609. However, the court is not required to draw every conceivable inference from the record—only reasonable ones. *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989). Pursuant to a local rule governing summary judgment motions filed in this judicial district, the Court is to assume that the facts claimed by the moving party and supported by admissible evidence are admitted to exist without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence. N.D. Ind. L.R. 56.1(b).

## STATEMENT OF FACTS

Viewing the facts in a light most favorable to the non-movant, the Plaintiff, and drawing all reasonable inferences in his favor, the Court finds the following facts.

### A. The Parties, the Hammond Plant, and the Control Room

The Defendant produces bars of soap at a plant in Hammond, Indiana (Hammond plant).

The Hammond plant operates twenty-four hours each day, 365 days each year. At the Hammond plant, the soap production process is controlled from the control room, which contains two computerized control panels. One panel controls the production of Dove soap, and the other controls the production of Lever soap. Each panel is controlled by a different control room operator. Control room operators work around the clock in three shifts, and they are assigned to crews that rotate together from shift to shift. Each control room operator crew consists of three members. During a shift, two members of the crew operate the control panels, and the third member will either be off work, on break, or relieving someone elsewhere at the Hammond plant. The control room operator position is a challenging job and mistakes by the operator (such as improperly mixing ingredients that result in soap of the wrong scent or color) can be costly to the Defendant.

In March 1992, the Defendant hired the Plaintiff as a utility operator to work at the Hammond plant, and his duties included cleaning floors and machinery and taking samples of soap. The Plaintiff also held other positions at the Hammond plant, including line operator, general worker, and control room operator trainee. Throughout his employment with the Defendant, the Plaintiff was a member of a union that represented him in disciplinary matters. The collective bargaining agreement (CBA) between the Defendant and the union contained a grievance procedure, which permitted the union to file grievances on behalf of employees. Under the CBA, if the union was not satisfied with the resolution of a grievance, the union had the right to take that grievance to arbitration.

The Defendant has a Non-Discrimination and Anti-Harassment Policy that employees at the Hammond plant are required to read and acknowledge. All employees at the Hammond plant

are required to take annual anti-harassment/anti-discrimination training. The Hammond plant also has a Corrective Action/Disciplinary Policy that all employees are required to read and acknowledge. It prohibits "[o]verstaying breaks/lunch periods." (Cole Decl. Ex. 7 at 8.) On December 17, 2003, the Plaintiff signed a document acknowledging receipt of the Hammond plant's Corrective Action/Disciplinary Policy.

Profanities and off-color phrases are sometimes used in the control room and elsewhere at the Hammond plant. Horseplay, joking, off-color humor, and talk about sex occurred in the control room while the Plaintiff worked there, and people working in the control room used the words "fuck" and "fucking." (Pl. Dep. 209.) The Plaintiff indicated that he is "sure there were times probably" when people at the Hammond plant used the term "faggot." (Pl. Dep. 210.) The Plaintiff himself uses some profane words, and he has used profanities at the Hammond plant. At least on occasion, the Plaintiff uses the words "fuck" or "fucking." (Lisa Kolanowski Dep. 24.)


**B.      The Plaintiff's Disciplinary Record**

The Defendant has taken several formal disciplinary actions against the Plaintiff during his employment. The Plaintiff received a written warning dated August 19, 1994, for "leaving early and returning late from breaks." (Cole Decl. ¶ 3; Cole Decl. Ex. 1.) He received an oral warning dated August 31, 1995, for "[c]ontinued disruption of dept. operations through ongoing arguing, bickering & grandstanding." (Cole Decl. ¶ 3; Cole Decl. Ex. 2.) He received a written warning dated May 18, 2001, for being "abusive and coercive to a fellow employee." (Cole Decl. ¶ 3; Cole Decl. Ex. 3.) Additionally, in December 2001, the Defendant determined that the Plaintiff had stolen from another employee. As a consequence, the Plaintiff was informed that

his employment would be terminated, unless he signed a five-year last chance agreement, which was dated January 18, 2002. The Plaintiff, the Defendant (by A. Cradle, manager of employee relations), and a union representative signed the agreement. Brad Tieke (Hammond plant manager), Chris Cole (human resources manager at the Hammond plant), Kelly Sheppard (DEFI business unit manager),[3] and Don Fedor (manager at the Hammond plant) had no involvement with the circumstances that resulted in the Plaintiff signing his last chance agreement. When the Plaintiff signed the last chance agreement, Tieke, Cole and Sheppard were not employed at the Hammond plant and had no involvement with the agreement.

Formal disciplinary actions issued to Hammond plant employees are maintained in files kept by the Human Resources Department. When an employee has engaged in conduct that warrants termination, the Defendant may, in certain circumstances, agree to keep the employee under a "last chance agreement" with the union and the employee. Under such an agreement, the employee retains his job subject to the condition that if, in the Defendant's sole discretion, the employee engages in any further unacceptable conduct or performance while the last chance agreement remains in effect, the Defendant may terminate the employee, and the union will not file a grievance.

C.      **The Plaintiff's Control Room Training**

The Defendant provides a control room operator training program that lasts 160 days. The training is provided primarily by existing control room operators. Trainees receive a training manual and a Control Room Operator Training Timeline that explains what trainees should learn

---

[3] The building in which soap is made at the Hammond plant is referred to as the DEFI 15 building.

during the training program. During the first 80 days of the training program, trainees obtain the knowledge necessary to do the job. During this evaluation phase, trainees are given three separate oral knowledge-oriented tests. During the second 80 days, trainees apply the knowledge obtained but while under supervision. During this certification phase, trainees are evaluated based on their on-the-job performance, and the Defendant expects that trainees will not make any serious mistakes because the training they already received should have adequately prepared them to perform the job. At the end of the certification phase, the Defendant determines whether a trainee should be certified as a control room operator based upon the trainee's performance on six performance criteria: safety, productivity, process knowledge, troubleshooting, record keeping, and communications. Those who successfully complete the control room operator training program are certified as control room operators.

In January or February 2005, the Plaintiff entered the control room operator training program. He was assigned to control room operator crew number 2, which included union president Mike Ward, Jerry Szymoniak, and Sue Szynalik. Occasionally, other control room operators would fill in on the crew. As a trainee, the Plaintiff worked with the following control room operators: the other members of crew number 2 (Ward, Szymoniak, and Szynalik), Jesus Vasquez, Brian Gamblin, and Bob McDaniels. Szymoniak, Szynalik, Vasquez, Gamblin, and McDaniels helped to train the Plaintiff in the control room. Ward, Szymoniak, Vasquez, Gamblin, and McDaniels have attested that the Plaintiff received the same training as others who went through the control room operator training program around the same time, and these individuals have also stated that they did not observe anyone refuse to train the Plaintiff or to respond to his questions.

When the Plaintiff was in the training program, managers Fedor and Tom McFarland were responsible for evaluating trainees and determining whether they should be certified operators. Although these two managers were evaluators, neither was the Plaintiff's supervisor while he was working in the control room. During the evaluation phase, the Plaintiff passed the first test, failed the second, was given additional time and a list of things to work on, and then passed the third. After passing the third test, Fedor and McFarland determined that the Plaintiff had passed the first phase, the evaluation phase.

During the certification phase of his training, front line manager Fred Matthews documented that the Plaintiff failed to properly effectuate a soap color change, resulting in the production of soap of the wrong color. (Pl. Dep. Ex. 25.) Approximately one month later, front line manager Vincent DiPietro documented that the Plaintiff failed to perform another soap color change, resulting in "excess downtime on the line as well as forcing the next shift to perform the required changeover." (Pl. Dep. Ex. 26.) The Plaintiff had been trained to perform (and had performed) the change-over during the evaluation phase of his training. During the certification phase of his training, control room operators (including union president Ward, Szymoniak, Bob Bodomer, McDaniels, and Szynalik) had complained that the Plaintiff was not paying attention and that the Plaintiff was being combative and argumentative. According to Ward, Szymoniak, Vasquez, and Gamblin, the Plaintiff "had poor communication skills and did not get along well with the other Control Room Operators." (Ward Decl. ¶ 12; Szymoniak Decl. ¶ 3; Vasquez Decl. ¶ 2; Gamblin Decl. ¶ 3.) Union president Ward has attested that the Plaintiff had a difficult time multi-tasking and applying the knowledge he had acquired during the evaluation phase, that the Plaintiff did not work very hard, and that he warned the Plaintiff that he would fail if he did not

start working harder. Similarly, McDaniels has stated that the Plaintiff "would spend more time trying to avoid work than it would take to actually do the work. He seemed like he always wanted to 'buck the system.'" (McDaniels Decl. ¶ 3.)

On October 13, 2005, Fedor and McFarland met with the Plaintiff, conducted a review of his certification phase performance, and informed the Plaintiff that he had failed the certification phase. The Plaintiff's performance was evaluated based upon the six standard criteria. A memorandum dated October 14, 2005, and prepared by Fedor provides the following summary of the Plaintiff's performance based upon the standard criteria:

1) Safety: Jim had no safety incidents during his certification period.
2) Productivity: Jim showed lacks in productivity in areas of batch production, filling of ZNO buckets for all crews, relieving operators on the 2nd floor, running lines out of soap due to inactivity and batch quality issues due to lack of proper procedure. Reference Fred Matthews document 8/22/05/ Reference Vince DiPietro 9/20/05.
3) Process: Jim showed no improvement in process knowledge from evaluation time to the present.
4) Troubleshooting: Jim did not show the ability or desire to improve troubleshooting capability on several occasions leaving problems for the next crew without explanation. No documentation available.
5) Record keeping: Jim entered batch logs properly.
6) Communication: Jim showed lack of communication with his peers that resulted in tension and often combative exchanges to the point where his peers felt intimidated and resulted in productivity issues. Note: no documentation due to peers wishing their comments concerning Jim to be off the record.
   Due to the documented productivity issues and lack of communication with his peers Tom McFarland and myself have decided in the best interest of [t]he process team to deny Jim his certification for defi control room MEL path.

(Pl. Dep. Ex. 24.) The Plaintiff was given a document stating that he failed certification for the following reasons: "Jim failed to meet an acceptable level of expectation in the Defi Control Room Skill Block. Jim has had 2 write ups pertaining to Job performance which caused quality issues as well as downtime. Jim has also had issues with communicating issues with his fellow

10

Operators." (Pl.'s Dep. Ex. 23.) During the period in which Fedor was involved with the training process, he evaluated approximately 10 to 20 individuals for possible certification, and none of the trainees that Fedor certified as a control room operator received any counseling or write-ups of any kind for mistakes during the certification phase. Other than the Plaintiff, Fedor is not aware of any other trainee who passed the evaluation phase and then received counseling for poor performance in the certification phase. The Plaintiff has admitted that he has no personal knowledge as to how Fedor and McFarland applied the six certification criteria to any other control room operator trainee or as to how many people Fedor and McFarland determined did not pass control room operator certification. After he failed to pass the control room operator certification, the Plaintiff returned to the job duties he held prior to entering the training program. Union president Ward has stated that the Plaintiff never complained to him about the quality or adequacy of the Plaintiff's control room operator training or about the refusal of any individual to train him or answer his questions until after the Plaintiff had already failed the certification phase.

After the Plaintiff failed the certification phase of the training program, union president Ward filed a grievance on the Plaintiff's behalf and processed it through Step III of the grievance procedure (a conference involving the plant manager and a union representative with the executive board). The Plaintiff, Ward, Tieke (Hammond plant manager), and Cole (Hammond plant human resources manager) attended the Step III grievance hearing. Tieke informed the union by a written memorandum dated January 13, 2006, that the Plaintiff's grievance was denied. Ultimately, Ward determined that the Plaintiff's grievance did not have sufficient merit to warrant arbitration based upon his assessment that the Plaintiff would lose any

arbitration. At a union meeting on March 6, 2006, the union's board decided not to take the

Plaintiff's grievance to arbitration. The Plaintiff was informed that he could appeal the board's

decision to the union membership to see if they wanted to overrule the union board. At a union

meeting held on April 3, 2006, the Plaintiff asked the union membership to overturn the board's

decision not to take his grievance to arbitration. After discussing the merits of this grievance, the

union membership voted not to overrule the board, and the Plaintiff's grievance was not taken to

arbitration. Ward has stated that at no time during this grievance process did the Plaintiff indicate

that he believed that he had been sexually harassed or retaliated against for complaining about

sexual harassment.


**D.     The Alleged Sexual Harassment by Szynalik and the Plaintiff's Complaints**

The Plaintiff, who weighs about 205 pounds, has testified that Szynalik, a female co-

worker who is shorter than the Plaintiff, sexually harassed him over an eighteen-month period,

from January or February 2005 to the time of his termination. According to the Plaintiff, she

engaged in the following sexually harassing conduct: (1) she called the Plaintiff a "fucking

faggot" between ten and thirty times (Pl. Dep. 193–97); (2) she "smacked" or "hit" him "on the

ass" with a flashlight twice (Pl. Dep. 194–95, 201–02); (3) she made "gestures" toward the

Plaintiff "numerous" times (although he does not know whether she did this more than five

times) (Pl. Dep. 204–05); (4) in response to his question regarding why she was closing a valve

that was no longer in use, she once stated, while holding a pipe wrench, "Come here, I'll show

you what a control valve is," and she "tried to stick the pipe towards [him] and [he] just left,

walked away" (Pl. Dep. 206), but she never actually touched him with the pipe wrench; and (5)

during the same episode, she called him "a stupid mother fucker" (Pl. Dep. 286). Szynalik did not "brush against [him], pinch [him], or do any of those other sorts of things." (Pl. Dep. 407.) The Plaintiff has identified no other acts of alleged sexual harassment by Szynalik, and he is not claiming sexual harassment by Fedor or any other employee of the Defendant.

The Plaintiff did not think that Szynalik might actually try to stick anything up his butt, that she was capable of doing so, or that she was going to stick the pipe wrench up his butt, and he did not believe that Szynalik was trying to get him to have sex with her. The Plaintiff believes that Szynalik did not want him to become a certified control room operator. He contends that Szynalik's alleged harassment interfered with his work performance in that it embarrassed him in front of his co-workers, caused him stress, resulted in him not getting proper control room operator training, and caused him to have to study at home. The Plaintiff has testified that he cries at times when he thinks about the alleged sexual harassment and the loss of his job, but he has not sought treatment from a psychiatrist, psychologist, or other mental health professional for the emotional distress. The Plaintiff is married to Lisa Kolanowski, and he is not a homosexual.

The Plaintiff has testified that he complained about Szynalik's alleged sexual harassment to the following persons while he was going through the control room operator training program (from January or February 2005 to October 2005): Fedor in February 2005 in Fedor's office; Matthews in February 2005 on the third floor of the DEFI building; Fedor during the evaluation stage in McFarland's office with McFarland present; and Matthews on other occasions (but he could not recall dates or places). He has testified that he complained about Szynalik's alleged sexual harassment to following persons after failing the certification stage on October 13, 2005:

Cole on October 17, 2005, in Cole's office; Tieke on October 17, 2005, on the second floor of the DEFI building with Sheppard and Cole present; and Sheppard on other occasions (close to five times) between when he failed the certification stage and the termination of his employment in July 2006. The Plaintiff never made a written complaint of sexual harassment, but he called the Defendant's ethics hotline to complain about sexual harassment.

As the human resources manager at the Hammond plant, Cole is responsible for investigating any complaints of sexual or racial discrimination or harassment and for maintaining records of any such complaints. Since February 2005, the Plaintiff is the only union member at the Hammond plant to claim that he has suffered sexual harassment or filed a charge or lawsuit alleging any form of discrimination or retaliation. (Cole Decl. ¶ 6.)

**E.      The Plaintiff's "Bingo"-related Incident**

On June 27, 2006, the Defendant through its employee recreation committee sponsored "bingo" games in three half hour bingo sessions in several of the Hammond plant's break rooms during lunch time. Bingo was played in the break room of the DEFI 15 building and in the break room of the Hammond plant warehouse, which is located in a building adjacent to the DEFI 15 building. The warehouse break room seats approximately seven to ten persons. In the warehouse break room on June 27, each of the following individuals ran a session of bingo: Mike Ventrella (department manager in the warehouse), Chris Smulski (front line manager in the warehouse), and Jim Bassett (front line manager in the warehouse).

On that day, the Plaintiff was assigned to work on the fourth floor of the DEFI 15 building, and it takes approximately five minutes to go from the fourth floor of the DEFI 15

building to the warehouse break room. According to the Plaintiff, he left his work area to take supplies to the warehouse when he went by the warehouse break room and observed the bingo being played there. The Plaintiff decided to join the game. The Plaintiff was not wearing a watch and did not check any clock when he entered the warehouse break room. The Plaintiff never asked any of his own supervisors for permission to play bingo in the warehouse break room on that day, and he never told his supervisors where he was or when he would return to his work area. On that day, the warehouse supervisors who ran the bingo game in the warehouse break room were not supervising the Plaintiff, did not control his work or break schedule, and had no authority to tell the Plaintiff when he could or could not take a break.

On June 28, Cole was informed that on June 27 the Plaintiff, without permission from his supervisor, had been away from his work station for approximately ninety minutes playing bingo in the warehouse break room. Cole received no report that any employee other than the Plaintiff played bingo on June 27 for an extended period of time, and the only employees (other than Plaintiff) who attended more than one half hour session of bingo in the warehouse break room on that day were the members of the employee recreation committee (Margaret Garrett, Stefanie Evans, and Linda Washington) who were authorized to do so because they were helping to set up, run, and take down the event. The Plaintiff testified that he could not recall anyone other than Garrett, Evans, and Washington who were present for the entire time he was playing bingo and he could not verify which employees came in and out of the warehouse break room while he was there on that day.

Because the Plaintiff was subject to a last chance agreement, Cole advised union president Ward about the incident and, after conducting a preliminary investigation, suspended

the Plaintiff pending further investigation. Sheppard and Cole began a more comprehensive investigation, during which Cole interviewed Ventrella, Smulski, and Bassett, the managers who had run bingo sessions on June 27. Pursuant to Cole's request, each signed a written statement indicating that the Plaintiff played bingo from 10:40 a.m. to 12:00 p.m. on June 27.

**F.       The Plaintiff's Forklift-related Incident**

During the course of Cole's investigation into the Plaintiff's bingo-related conduct, Sheppard informed Cole that he had just received a report from the contractor who maintains the electric forklifts at the plant (i.e., Dave Plinovich from Atlas Lift Truck) that he had seen the Plaintiff trying to plug an electric forklift directly into an electric charger, which shortens the life of the battery. Cole asked Sheppard to investigate. Fedor prepared a written statement that both he and Plinovich signed regarding this incident. Cole discussed with Fedor what the Plaintiff had done and reviewed the Plinovich statement. Cole learned that when an electric forklift battery needs to be recharged, the battery should be removed and replaced by a fully charged battery, and that a battery can be damaged when a dead battery (still installed in an electric forklift) is recharged by plugging it directly into a charger. Additionally, Cole was informed that the Plaintiff had not only attempted to recharge a battery while still installed, but that he had attempted to insert the plug into a charger outlet that was of the wrong size and could have been of the wrong voltage. Cole concluded that the Plaintiff, in an effort to save himself time by not removing the dead battery and replacing it with a fully charged battery and by forcing the plug into the charger outlet, had violated company procedures and had created a dangerous situation that could have resulted in injury to the Plaintiff and damage to the forklift battery in the event

that the battery exploded or the Plaintiff was electrocuted. While Cole was investigating the Plaintiff's bingo-related conduct, Cole told union president Ward that Plinovich reported seeing the Plaintiff attempt to plug a dead forklift battery directly into a charger and to force a plug into a charger outlet that was the wrong size. Ward considers such conduct inappropriate and potentially dangerous.


G.      **The Defendant's Meeting with the Plaintiff and the Union and the Termination Decision**

As of June 27, 2006, four employees at the Hammond Plant were working under last chance agreements: the Plaintiff, Thaddeus Kolasa, Thomas Gadus, and Doreen Soucy. Each of these agreements was entered in to before Cole became the human resources manager at the Hammond plant, and Cole was not involved with the circumstances that led to these agreements. With the exception of the Plaintiff, each of these employees is still employed at the Hammond plant. The Plaintiff has testified that he does not know whether any other employees at the Hammond plant were on a last chance agreement as of June 27, 2006.

Union employees at the Hammond plant are entitled to take a paid 15-minute rest break in the morning, a paid 30-minute lunch break, and a paid 15-minute rest break in the afternoon, for

a total of one hour for an entire shift. Cole has attested that he has disciplined approximately ten union employees for taking excessively long rest or lunch breaks and that he has never ignored a situation in which it was reported to him that an employee took an excessively long rest or lunch break. Ward has attested that, during his tenure as a union officer, several union employees have been disciplined for taking excessively long rest or lunch breaks. Neither Cole nor Ward is aware

17

of any employee on a last chance agreement who took an excessively long lunch or rest break other than the Plaintiff.

After Sheppard and Cole gathered written statements from managers Ventrella, Smulski, and Bassett regarding the Plaintiff's participation in the June 27 bingo games, Cole asked Ward and the Plaintiff to attend a meeting to discuss the Plaintiff's June 27 conduct and the resulting suspension. This meeting took place on July 11, 2006. Sheppard, the Plaintiff, Ward, and Cole attended the meeting. Ward was the Plaintiff's representative at this meeting and was authorized to speak on the Plaintiff's behalf. According to Ward's notes from the meeting, Ward stated that "[w]hile driving by the Warehouse break room [the Plaintiff] noticed lunch time bingo was being played. Since [the Plaintiff] had not taken any break yet and knowing that when a tour goes through the Utility operators have been told for years to clear the area, [the Plaintiff] walked in the Warehouse break room and asked Mike Ventrella if he could play? Mike Ventrella said yes and [Plaintiff] sat down and started playing bingo."[4] (Pl. Dep. Ex. 36.) Ward acknowledged that the Plaintiff had lost track of time while playing bingo and that, although the Plaintiff had not yet taken a break that day, the amount of time that he spent playing bingo was longer than the combination of his standard morning break plus his lunch break. Ward did not claim that the Plaintiff was authorized to play bingo for the amount of time that he did or that the Plaintiff was authorized to take a longer break than was permitted. Although Ward requested that the Defendant act mercifully and consider alternative forms of discipline, he acknowledged that the Defendant had the discretion to decide whether the Plaintiff's actions on June 27 warranted termination because the Plaintiff was on a last chance agreement. At the meeting, the Plaintiff

---

[4] The Plaintiff has conceded that Ward's notes accurately reflect what was said at the July 11, 2006, meeting.

explained that he had lost track of time on that day.

After the July 11 meeting, Sheppard and Cole spoke with Hammond plant manager Tieke regarding the investigation and the meeting with Ward and the Plaintiff. Because the Plaintiff was on a last chance agreement, Sheppard and Cole recommended that the Plaintiff's employment be terminated, and Tieke agreed. Cole has stated that, if the Plaintiff had not been on a last chance agreement, he would not have recommended termination.

On July 11, after speaking with Tieke about the Plaintiff's termination, Cole sent an e-mail message to Karen Olsen (then the Defendant's Regional Human Resources Manager and Cole's immediate supervisor) and Russ Ritger (the Defendant's Manager of Labor Relations) with carbon copies to Tieke and Sheppard summarizing the facts supporting his termination recommendation. (Cole had previously informed Olsen and Ritger about the Plaintiff's suspension pending investigation.) The message stated:

> Kelly Sheppard, DEFI Business Unit Manager, and I have completed our investigation of the Kolanowski performance and conduct incidents during the week of June 26, 2006. Because we now have received documented and signed testimony from several managers and other witnesses concerning two specific incidents, we recommend that hourly employee James Kolanowski be terminated effective immediately.
>
> To recap, Mr. Kolanowski was placed on a five year "Last Chance Agreement" on January 18, 2002 due to his admitted theft of another employee's personal property. Mr. Kolanowski signed this "Last Chance Agreement" knowing that he could not violate any standard policy or procedure going forward and agreed to perform his duties in an acceptable manner as determined at the sole discretion of management and without grievance by the Union. On June 27, 2006 Mr. Kolanowski was seen by several managers and others out of his work area on break for approx. 90 minutes which is a direct violation of our standard policy. The very next day, June 28th, Mr. Kolanowski was seen trying to connect a tractor battery to the wrong battery charger. This known safety violation could have caused a serious safety hazard to the employee and others and could have resulted in extensive damages to the battery.
>
> Understanding all this, Mr. Kolanowski was indefinitely suspended on Friday June 30th after our preliminary investigation. Now that we have

corroborated all witness testimony for these events in writing, we would like to move forward with the discharge of Mr. Kolanowski.

(Cole Decl. Ex. 13.) Soon thereafter, Olsen called Cole and expressed her agreement with the termination recommendation, and Cole prepared a termination letter for Tieke's signature. As the Hammond plant manager, Tieke has the final authority on all terminations at the Hammond plant and was the ultimate decision maker with respect to the Plaintiff's termination. After the Plaintiff was informed of his termination, he called Tieke, Cole, and Sheppard to find out what was going on and to get his job back. During these calls, the Plaintiff did not mention sexual harassment.

**H.      The Plaintiff's Testimony Regarding Pre-Termination Retaliation.**

The Plaintiff has testified that co-worker Szynalik retaliated against him for complaining about her alleged sexual harassment by refusing to train him in the control room operator training program and by embarrassing him in front of co-workers. He has testified that co-worker McDaniels retaliated against him for complaining about Szynalik's alleged sexual harassment by refusing to train him while he was going through the control room operator training program. The Plaintiff formed his opinion that McDaniels was retaliatory because of "the timing and everything, how it happened" (Pl. Dep. 258), but he cannot recall whether McDaniels ever said anything to him about his alleged complaints about Szynalik's sexual harassment or how McDaniels even knew that the Plaintiff had complained about Szynalik's alleged sexual harassment.

The Plaintiff has testified that Fedor retaliated against him for complaining about Szynalik's alleged sexual harassment by not certifying him as a control room operator, by following the Plaintiff in the warehouse, and walking or darting out in front of the Plaintiff two

20

or three times while the Plaintiff was operating a forklift in the warehouse. The Plaintiff admitted that he is speculating about Fedor's motivation for walking in front of the Plaintiff and does not know what was going through Fedor's mind. The Plaintiff conceded, contrary to his allegation in his Charge of Discrimination, that he does not know whether Fedor wrote him up for any alleged misconduct after the Plaintiff left the control room operator training program. Fedor did not, in fact, write up the Plaintiff after he left the program. The Plaintiff has testified that plant manager Tieke retaliated against him for complaining about Szynalik's alleged sexual harassment by denying the Plaintiff's certification grievance and that Ward told him that the grievance was denied because he brought up the sexual harassment issue. He has also testified that this indication from Ward is the only basis he has for his belief that his failing the control room operator certification was in retaliation for his complaints about Szynalik's harassment.

**H.**     **The Plaintiff's Testimony Regarding the Retaliatory Discharge**

The Plaintiff has testified to his belief that his employment was terminated in retaliation for his complaints about Szynalik's alleged sexual harassment. He believes that his termination was retaliatory for the following reasons: (1) the accusations about his misconduct are false; (2) no manager investigated his alleged complaints about Szynalik's alleged sexual harassment; (3) union president Ward told the Plaintiff that both Cole and Sheppard told Ward that the Plaintiff was not going to be fired and then he was; (4) Ward said that the Plaintiff's termination "was all because of Don [Fedor] coming over there and bringing up all these issues" (Pl. Dep. 266); (5) the Plaintiff overheard a telephone call between Ward and human resources manager Cole in July 2006 in which Cole allegedly said that he was not going to fire the Plaintiff, that it was up to

21

Kelly Sheppard and others, but that it would be Sheppard's decision on what they were going to do; and (6) Ward told the Plaintiff that persons "higher" up than Cole and Tieke were "putting some influence in on what's going on there." (Pl. Dep. 268.)

## DISCUSSION

The Plaintiff claims that the Defendant is liable under Title VII for hostile working environment/sexual harassment, pre-termination retaliation, and retaliation in the termination of his employment. The Defendant has moved for summary judgment on these claims arguing that the alleged sexual harassment incidents are not sufficiently severe or pervasive to constitute a hostile work environment, that the Plaintiff's pre-termination retaliation claim is fatally flawed, and that his retaliatory discharge claim is meritless. The Plaintiff argues that the harassment was sufficiently severe or pervasive and that genuine issues of material fact exist as to his pre-termination retaliation claim and retaliatory discharge claim.

## A.    The Plaintiff's Response and Statement of Genuine Issues of Material Fact

Before addressing the Plaintiff's claims, the Court must consider the Plaintiff's submissions. Local Rule 56.1 provides that a party opposing a motion for summary judgment shall "serve and file any affidavits or other documentary material controverting the movant's position, together with a response that shall include in its text or appendix thereto a 'Statement of Genuine Issues' setting forth, with appropriate citations to discovery responses, affidavits, depositions, or other admissible evidence, all material facts as to which it is contended there exists a genuine issue necessary to be litigated." The Plaintiff's Statement of Genuine Issues of

Material Facts fails to conform to this standard. The Plaintiff's Statement presents argument, attempts to reframe the Plaintiff's claims, quibbles with facts that are not material, makes assertions that are not supported by citations to evidentiary materials, but fails to distill for the Court those material facts as to which the Plaintiff contends there exist genuine issues that require a trial. Consequently, the Plaintiff's Statement hampered (rather than assisted) the Court with a review of the pending Motion and the relevant issues.

**B.      The Plaintiff's Hostile Working Environment Claim**

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is actionable under Title VII when it is so severe or pervasive that it alters the conditions of a plaintiff's employment and creates an abusive working environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)

For his claim to survive summary judgment, the Plaintiff must be able to show that he was subjected to unwelcome conduct because of his sex, that the conduct was so severe or pervasive that it created a hostile or abusive working environment, and that there is a basis for the Defendant's liability. *Berry v. Chi. Transit Auth.*, — F.3d —, 2010 WL 3294720, at *3 (7th Cir. Aug. 23, 2010). In order to be actionable under Title VII, a hostile work environment must be both objectively and subjectively offensive, such "that a reasonable person would find the environment hostile or abusive, and . . . that the victim in fact did perceive [it] to be so." *Faragher*, 524 U.S. at 787; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Of course,

drawing the line between actionable and nonactionable sexual harassment "is not always easy."

*Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995); *see also Robinson v.*

*Sappinton*, 351 F.3d 317, 329 (7th Cir. 2003) (noting that the inquiry is fact intensive and that

there is no "mathematically precise test"). The Seventh Circuit has explained:

> On one side lie sexual assaults; other physical contact, whether amorous or
> hostile, for which there is no consent express or implied; uninvited sexual
> solicitations; intimidating words or acts; obscene language or gestures;
> pornographic pictures. On the other side lies the occasional vulgar banter, tinged
> with sexual innuendo, of coarse or boorish workers . . . . It is not a bright line,
> obviously, this line between a merely unpleasant working environment on the one
> hand and a hostile or deeply repugnant one on the other.

*Baskerville*, 50 F.3d at 430–31 (citations omitted). In evaluating whether a workplace is hostile,

a court must look at the totality of the circumstances, including the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 685 (7th Cir. 2010). A single act can

create a hostile environment if it is sufficiently severe, and instances of uninvited physical

contact with intimate parts of the body are among the most severe types of sexual harassment.

*Berry*, — F.3d at —, 2010 WL 3294720, at *4.

The Plaintiff claims that the following conduct by Sue Szynalik, a female co-worker, was

unwelcome: (a) Szynalik called him a "fucking faggot" between ten and thirty times; (b) on two

occasions, she "hit" or "smacked" him "on the ass" or "butt" with a flashlight, and on one of

these occasions, he "just felt a flashlight against my ass like shoving it in there against my butt"

(Pl. Dep. 194, 195, 201, 202); (c) she made "gestures" toward him "numerous" times, including

telling him to bend over and saying "Come here, bend over so I can stick it up your ass" (Pl.

Dep. 204), but he could not recall whether she did this more than five times; (d) she told him on one occasion while holding (but not touching him with) a pipe wrench, "Come here, I'll show you what a control valve is," and she "tried to stick the pipe towards [him] and [he] just left, walked away" (Pl. Dep. 206); and (e) she called him a "stupid mother fucker" (Pl. Dep. 286). The Plaintiff alleges that this conduct occurred over an eighteen-month period, from January or February 2005 up to the termination of his employment in July 2006. The Plaintiff has testified that Szynalik engaged in no other harassing conduct and that Szynalik did not brush up against him, pinch him, or do "any of those other sorts of things."[5] (Pl. Dep. 407.)

Construing the facts in the light most favorable to the Plaintiff, as the Court must at this stage of the litigation, the Court finds that the Plaintiff was not subjected to Szynalik's alleged conduct because of his sex. In other words, they were not because of his gender as a male. The Plaintiff has testified that he never believed that Szynalik was trying to get him to have sex with her and that he believes Szynalik simply did not want him to become certified as a control room operator. Furthermore, the Plaintiff and Szynalik were co-workers who worked together in a factory setting, in which employees joked, talked about sex, and used profanity. The Plaintiff himself used some profanity in the workplace. The sexual references in this case were "incidental to what was otherwise run-of-the-mill horseplay and vulgarity." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1010 (7th Cir. 1999) (stating that "it is not at all unusual in some settings for people to taunt one another using profanity which, although facially sexual, has little

---

[5] In his deposition testimony, the Plaintiff stated that he does not claim that anyone other than Szynalik sexually harassed him.

or nothing to do with the gender of the individuals trading insults").[6]

The Court also finds that Szynalik's conduct was not sufficiently severe or pervasive to create an objectively hostile working environment.[7] Szynalik apparently called the Plaintiff a "fucking faggot" somewhere between ten and thirty times in an eighteen-month period. Such name-calling is offensive, but in this case it was infused with ambiguity because the Plaintiff is a married, heterosexual man, which helps to diminish the offensiveness of the comment in this case. As the Seventh Circuit has observed, "[t]he 'occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers' generally does not create a work environment that a reasonable person would find intolerable." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941 (7th Cir. 2007) (quoting *Baskerville*, 50 F.3d at 430). Additionally, the two incidents in which Szynalik hit the Plaintiff's buttocks with a flashlight were isolated and milder than what occurs

---

[6] In *Shepherd*, the Seventh Circuit provided the following discussion, which has informed the Court's analysis here:

> Whether the sexual content of the harassment is indicative of sex discrimination must . . . be examined with attention to the context in which the harassment occurs. The Supreme Court so stated with respect to the objective severity of the harassment, and we believe the Court's observations in that regard are apropos here as well. Where it appears plain on the record as a whole that the statements or conduct in question were nothing other than vulgar provocations having no causal relationship to the plaintiff's gender as a male, the sexual content or connotations of those statements or conduct will not alone raise a question of fact as to the sex-based character of the harassment. On the other hand, when the context of the harassment leaves room for the inference that the sexual overlay was not incidental—that the harasser was genuinely soliciting sex from the plaintiff or was otherwise directing harassment at the plaintiff because of the plaintiff's sex—then the task of deciding whether the harassment amounts to sex discrimination will fall to the finder of fact.

*Id.*, 168 F.3d at 1010–11 (discussing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998), and *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir. 1997)) (quotation marks, alterations, and citations omitted).

[7] The Defendant has presented evidence having the tendency to show that union president Ward, Szymoniak, Vasquez, Gamblin, and McDaniels never observed, heard, or were informed about any incident in which Szynalik behaved inappropriately toward the Plaintiff; never heard Szynalik call the Plaintiff a "fucking faggot" or any other profane name; never saw Szynalik hit or poke the Plaintiff with a flashlight or any other object; and never saw Szynalik make any sort of "humping" or sexual gesture of any sort, let alone such a gesture toward the Plaintiff. (Ward Decl. ¶ 18; Szymoniak Decl. ¶ 4; Vasquez Decl. ¶ 3; Gamblin Decl. ¶ 4; McDaniels Decl. ¶ 4.) At this stage of the proceeding, the Court must not judge credibility or weigh evidence.

in other sexual harassment cases in that Szynalik did not touch the Plaintiff's buttocks with her hand or any part of her body.[8] Likewise, Szynalik's gestures were isolated, and her comments about sticking an item up his "ass" and showing him what a control valve is and her movement toward him with a pipe have inherent ambiguity. The Plaintiff's testimony confirms this because he never thought that she might actually try to stick anything up his butt or that she was capable of doing so and because he never believed that she was trying to get him to have sex with her. Likewise, Szynalik's "stupid mother fucker" comment was isolated, ambiguous, and not serious. As the Seventh Circuit has observed, "there is a 'safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex.'" *Adusumilli v. City of Chi.*, 164 F.3d 353, 362 (7th Cir. 1998) (quoting *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F.3d 1164, 1168 (7th Cir. 1996)); *see also id.* at 361 (stating that "'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment'") (quoting *Faragher*, 524 U.S. at 788) (quotation marks omitted). Considering that the Plaintiff weighs approximately 205 pounds and is taller than Szynalik, any physical threat was minor (at most).[9]

Consequently, the Court will grant the Defendant's Motion for Summary Judgment on the Plaintiff's hostile working environment claim.

---

[8] These two incidents involving a flashlight, an inanimate object, were the only incidents in which any physical contact was made with the Plaintiff's body.

[9] Because the Court finds that the Plaintiff cannot show that the workplace was objectively offensive, the Court need not address whether the Plaintiff found the workplace subjectively offensive or whether there is a basis for employer liability.

**C.     The Plaintiff's Pre-Termination Retaliation Claims**

1.     *The Plaintiff's Untimely Claims*

The Defendant contends that summary judgment is appropriate on the Plaintiff's refusal

to train and refusal to certify retaliation claims because they are time barred for not having filed

his Charge of Discrimination within the applicable period. The Plaintiff argues that these claims

are not time barred because they were part of a continuing violation and should be considered as

part of a pattern and practice with subsequent conduct.

Before a plaintiff may bring a lawsuit under Title VII, he is required to file a charge of

discrimination with the Equal Employment Opportunity Commission (EEOC). *Laouini v. CLM*

*Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009) (citing 42 U.S.C. § 2000e-5(e)(1)). Indiana

is a "deferral state" that has a state agency with enforcement powers parallel to those of the

EEOC, and consequently a plaintiff has 300 days from the alleged unlawful employment practice

to file a timely charge. *Id.* At summary judgment, the defendant bears the burden of showing as

an affirmative defense a failure to timely file an administrative charge. *Id.* The Supreme Court

has instructed that "discrete discriminatory acts are not actionable if time barred, even when they

are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new

clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101,

113 (2002). The Court in *Morgan* added: "Discrete acts such as termination, failure to promote,

denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each

retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment

practice.'" *Id.* at 114.

The Plaintiff filed his Charge of Discrimination on October 13, 2006. Consequently, any

pre-termination acts of retaliation that occurred before December 17, 2005, are outside the 300-day period and time-barred unless the continuing violation doctrine applies.[10] As to the Plaintiff's refusal to certify claim, Fedor and McFarland informed the Plaintiff that he failed the certification phase of his control room operator training on October 13, 2005. As to the Plaintiff's refusal to train retaliation claims against Szynalik and McDaniels, these claims relate to the alleged refusal of these control room operators to train the Plaintiff while he was in the control room operator training program.[11] The Plaintiff was in the control room operator training program from January or February 2005 to October 13, 2005. Consequently, all of this alleged retaliatory conduct occurred on or before October 13, 2005. The pre-termination retaliation conduct of which the Plaintiff complains involved discrete acts, and the Court is unpersuaded by the Plaintiff's attempt to characterize these acts as part of a continuing pattern of retaliation culminating in the termination of his employment. *See Turner*, 595 F.3d at 684 (explaining that the Supreme Court in *Morgan* held that "the statute of limitations applies differently depending on whether the plaintiff is asserting a claim for a discrete act of employment discrimination or for a hostile work environment"). Because these discrete acts of alleged retaliation occurred before December 17, 2005, they are not within the 300-day period preceding the filing of his Charge. Accordingly, the Plaintiff's refusal to train and refusal to certify retaliation claims were untimely filed and are no longer actionable. Thus, the Court finds that the Defendant is entitled to summary judgment on the Plaintiff's refusal to train and refusal to certify retaliation claims

---

[10] The Plaintiff does not invoke the doctrine of equitable tolling in support of his argument that these claims were timely filed.

[11] In his Charge and in his Complaint, Amended Complaint, and Second Amended Complaint, the Plaintiff did not allege that McDaniels retaliated by failing to train him, which provides additional reason to grant summary judgment on this claim.

because they are time barred.

2.      *The Merits of the Plaintiff's Pre-Termination Retaliation Claims*

The Plaintiff claims that the Defendant engaged in pre-termination retaliation because he complained about Szynalik's alleged harassment. The Defendant argues that the Plaintiff is not able to show that any refusal to train by Szynalik or McDaniels (both control room operators who were co-workers) was an adverse employment action and that the Plaintiff's refusal to certify claim fails under both the direct method and the indirect method of proof. In his Response, the Plaintiff focuses on the no-certification decision as an adverse employment action, not on the refusal to train as an adverse employment action. In referencing the no-certification decision (and possibly the refusal to train), he does argue that the actions affected his compensation, that his position was changed, and that he was subjected to humiliating, degrading conditions. The Plaintiff also argues that the reasons given in support of the Defendant's decision not to certify the Plaintiff are pretextual and that the Plaintiff's claims survive whether the direct method or the indirect method is applied.

Title VII makes it unlawful to discriminate against any employee who opposes a practice made unlawful by Title VII or because he made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a). This provision prohibits employers from taking actions that would likely deter victims of discrimination from complaining to the EEOC, the courts, and their employers. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). A plaintiff may establish unlawful retaliation using either the direct or indirect method of proof. *Id.* Under the direct method of proof, a plaintiff

must show the following to establish a prima facie case of retaliation: (1) that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that there is a causal connection between the two. *Id.* Under the indirect method, the first two elements remain the same, but instead of showing a direct causal link, the plaintiff must show that he was performing his job satisfactorily and that he was treated less favorably than a similarly situated employee who did not complain of discrimination or engage in statutorily protected activity. *Id.* at 786–87. Once a plaintiff establishes a prima facie case under the indirect method, the defendant must articulate a nondiscriminatory reason for its action; if he does, the burden remains with the plaintiff to demonstrate that the defendant's reason is pretextual. *Id.* at 787. On summary judgment, when a defendant articulates a legitimate nondiscriminatory reason for the employment action, the plaintiff must show a genuine issue of fact that the reason is a pretext for discrimination. *Argyropoulous v. City of Alton,* 539 F.3d 724, 737–38 (7th Cir. 2008).

As to the refusal to train claim, the Plaintiff has not shown a materially adverse action by the Defendant, the employer. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quotation marks and citation omitted). The Court finds that any alleged refusal to train by Szynalik or McDaniels did not amount to a "materially adverse" action that can support a retaliation claim. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Although acts that would dissuade a reasonable employee from making a claim of discrimination can constitute actionable retaliation, *id.*; *Lewis*

*v. City of Chi.,* 496 F.3d 645, 655 (7th Cir. 2007), the alleged refusal of two of the Plaintiff's co-workers to train him does not rise to the "materially adverse" level, *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 902 (7th Cir. 2003) (explaining that performance evaluation unaccompanied by "tangible job consequences" is not materially adverse employment action), and the Plaintiff has not shown with evidence that the Defendant is responsible for this alleged action by two of the Plaintiff's co-workers. The record is clear that the Plaintiff did receive training from control room operators, that he passed the evaluation phase of the training program, but that the Plaintiff failed the certification phase during which he was to apply the knowledge he had gained during the evaluation phase.

As to the Plaintiff's refusal to certify claim, under the direct method, when issues of fact exist regarding whether there is a causal connection between statutorily protected activity and a defendant's adverse employment action, "the case must be tried unless [the Defendant] presents unrebutted evidence that [it] would have taken the adverse employment action against [the Plaintiff] even if [it] had no retaliatory motive; in that event [the Defendant] is entitled to summary judgment because [it] has shown that [the Plaintiff] wasn't harmed by retaliation." *Antonetti v. Abbot Labs.*, 563 F.3d 587, 593 (7th Cir. 2009). The evidence before the Court shows that the Defendant would have decided not to certify the Plaintiff as a control room operator even without any retaliatory motivation. The Plaintiff had received counseling and two write-ups regarding poor performance in the certification phase. The Defendant evaluated the Plaintiff on the basis of the six certification criteria that are applied to all control room operator trainees, and his poor performance on productivity and communication issues was well-documented and well-corroborated. The Plaintiff has also testified that he has no firsthand

knowledge of how Fedor and McFarland applied the six criteria. The Plaintiff has not rebutted the Defendant's evidence.

Under the indirect burden-shifting method, the Plaintiff has not shown that he was performing his job satisfactorily, that he was treated less favorably than a similarly situated employee who did not complain of discrimination or engage in statutorily protected activity, or that the Defendant's reason is a pretext for retaliation. *See Boumedhi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007) (noting that prima facie elements may be analyzed together with pretext where the issues overlap substantially). The evidence in the record shows that no employee certified by Fedor as a control room operator received any counseling or write-ups for mistakes during the certification phase. Additionally, the record before the Court shows that the Plaintiff was the only control room operator trainee to pass the evaluation phase and then receive counseling for his poor performance in the certification phase. Furthermore, he has not undermined the truthfulness of the Defendant's proffered reason for not certifying him, namely, that the Defendant's determination that his job performance was below the level required for the position. Although the Plaintiff has testified that he had not been approached by anyone other than Matthews during the certification phase regarding performance problems, the Defendant has shown that the Plaintiff had been written up twice during the certification phase for quality issues, that his performance measured against the six standard criteria was deficient (especially in the areas of productivity and communication), and that the Plaintiff has no personal knowledge as to how Fedor and McFarland applied the six criteria. The Plaintiff has not shown a genuine issue of fact that this reason proffered by the Defendant is a pretext for retaliation.

For these additional reasons, the Court will grant the Defendant's Motion for Summary

Judgment on the Plaintiff's pre-termination retaliation claims.[12]

### D.     The Plaintiff's Retaliatory Discharge Claim

The Plaintiff contends that his employment was terminated in retaliation for his complaints about Szynalik's alleged sexual harassment. The Defendant requests summary judgment on this claim because there is no direct evidence of retaliatory discharge and because the Plaintiff cannot survive summary judgment under the indirect method. In his Response, the Plaintiff proceeds under the indirect method arguing that the Plaintiff was treated differently than similarly situated employees and that the Defendant's reasons for terminating his employment are pretextual. The Defendant replies that the Plaintiff's silence as to direct evidence constitutes a concession that he cannot make the necessary showing under the direct method. As to the indirect method, the Defendant contends that the Plaintiff was not meeting the Defendant's legitimate expectations, was not treated different than any other similarly situated employee, and

---

[12] The Defendant also argues that summary judgment should be granted in its favor on two additional retaliation claims related to the conduct of Fedor and the conduct of plant manager Tieke. First, the Defendant requests summary judgment on any retaliation claim based upon Fedor's alleged walking or darting out in front of the Plaintiff while he was working in the warehouse and while he was operating a forklift because such conduct does not constitute a materially adverse employment action. The Plaintiff did not respond to the Defendant's argument that this conduct does not constitute a materially adverse employment action, but simply pointed to the Plaintiff's testimony that this walking or darting occurred. The Court agrees with the Defendant that the Plaintiff has not shown any materially adverse employment action because Fedor's alleged conduct was unaccompanied by any tangible job consequences, and the Court finds that summary judgment for the Defendant is appropriate on any such claim by the Plaintiff.

Second, the Defendant requests summary judgment on any claim that Tieke retaliated against the Plaintiff by denying the Plaintiff's grievance. The Plaintiff did not respond to this aspect of the Defendant's Motion for Summary Judgment. The Court agrees with the Defendant that this claim, which originated during the Plaintiff's deposition, was not included in the Plaintiff's Charge of Discrimination, and summary judgment for the Defendant is appropriate on any such claim by the Plaintiff. *Conner v. Ill. Dep't of Natural Res.*, 413 F.3d 675, 680 (7th Cir. 2005) ("[C]laims brought in judicial proceedings must be within the scope of the charges filed with the EEOC; [a]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination.") (quotation marks and citation omitted). Additionally, the Plaintiff in his Complaint, Amended Complaint, and Second Amended Complaint failed to allege that Tieke denied the Plaintiff's grievance in retaliation for the Plaintiff's alleged complaints about sexual harassment.

cannot show pretext.

The Court agrees that the Plaintiff appears not to proceed under the direct method, and the Court will analyze his retaliatory discharge claim under the indirect method. The Court finds that the Plaintiff's claim fails under the indirect method because the Plaintiff cannot show that he was performing his job satisfactorily or that he was treated worse than similarly situated employee who did not complain of sexual harassment. There is no dispute that the Plaintiff had been the subject of disciplinary action, that he was working with the Defendant under a last chance agreement, and that he was out of his work area without supervisory approval and playing bingo on June 27, 2006, for a period of time longer than the permissible rest and lunch breaks. In the record before the Court is evidence showing that the Plaintiff and union president Ward (speaking as the Plaintiff's representative) admitted that the Plaintiff lost track of time that day while playing bingo.[13] Additionally, on June 28, 2006, the Defendant learned from a contractor that the Plaintiff had engaged in conduct that posed a safety threat to himself and others and could damage property.[14] There is no evidence in the record before the Court showing a similarly situated employee who overstayed rest and lunch breaks but who was subject to more favorable disciplinary action. The Plaintiff cannot point to any other employee with a similarly checkered personnel file who was treated differently.

Even assuming that the Plaintiff could meet his initial burden to make out his prima facie

---

[13] Even in his Response, the Plaintiff acknowledges that he played bingo for slightly more than one hour, and the record is clear that additional time was required to travel from the Plaintiff's work station to the warehouse break room and to return.

[14] In his Response, the Plaintiff suggests that Fedor, also in retaliation for the Plaintiff's complaint about sexual harassment, drafted the report of the Plaintiff's safety hazard for Plinovich to sign. The Court agrees with the Defendant that this alleged retaliatory conduct is outside the scope of the Plaintiff's Charge of Discrimination and that summary judgment for the Defendant is warranted on any such claim.

case, the Plaintiff has not shown a genuine issue of fact that the Defendant's reasons for discharging the Plaintiff were a pretext for discrimination, and he has presented no evidence that undermines the truthfulness of the Defendant's proffered reasons for firing him, namely, that he violated the Defendant's policy by overstaying his authorized breaks on June 27, 2006, when he played bingo in the warehouse breakroom, and that he created a serious safety hazard. The Plaintiff asserts that the bingo-related basis is "completely pretextual" and that the safety-related incident is "completely bogus." (Pl.'s Resp. 13.) However, the Plaintiff must support these bald assertions with evidence. His claim that the bingo-related basis is pretextual is undercut by his own admissions to playing bingo for more than an hour on June 27, 2006, and his losing track of time. His strategy to undercut the safety-related basis is to argue that the conduct "could have caused no safety hazard nor cost the company any money at all because the battery at issue was incompatible with the charger at issue." (Pl.'s Resp. 13–14.) However, the Plaintiff must show that the Defendant's reason was a lie, not merely mistaken. *See Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 828 (7th Cir. 2008) (stating that the plaintiff has "the burden to come forward with evidence that [the employer's] reason was a pretext for discrimination. Evidence that an employer made a mistake or that the decision was ill-advised cannot meet this burden; an employer's explanation is a pretext for discrimination only if it is a lie."). Considering that the Plaintiff was working under a last chance agreement, the Plaintiff's attempt to claim pretext is insufficient to defeat summary judgment.

For these reasons, the Court will grant the Defendant's Motion for Summary Judgment on the Plaintiff's retaliatory discharge claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendant's Motion for Summary

Judgment [ECF No. 40]. The Court ORDERS the Clerk of this Court to enter judgment for the

Defendant and against the Plaintiff.

SO ORDERED on September 30, 2010.

/s Theresa L. Springmann
THERESA L. SPRINGMANN, JUDGE
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION